UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PATRICK NEIL KINNEY,

               Plaintiff,                                Case No. 2:08-cv-58

v.                                                HON. R. ALLAN EDGAR

CINDI S. CURTIN, et al.,

               Defendants.

_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. On August 6, 2008, this Court ordered service of Plaintiff's complaint on Defendants Curtin, Straub, Caruso, Tribley, McQuiggin, Sackett, Pittsley, and Burnett. On December 30, 2008, Defendants filed a motion for summary judgment (docket #46). Plaintiff filed a response and affidavit (docket #58) on January 23, 2009. Upon review, I recommend that Defendants' motion for summary judgment be granted.

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007). A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is

inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Plaintiff is presently incarcerated at the Alger Maximum Correctional Facility. In his *pro se* complaint, he sues Warden Cindi S. Curtin, MDOC Deputy Director Dennis Straub, MDOC Director Patricia Caruso, Deputy Warden Linda Tribley, Warden Greg McQuiggin, Resident Unit Manager Ralph Sackett, Mail Clerk A. Pittsley, and MDOC Special Activities Coordinator Dave Burnett.

Plaintiff alleges in his complaint that he has been kept in administrative segregation since he received a ticket for attempted escape at the Riverside Correctional Facility on February 13, 2004. Plaintiff was transferred to the Oaks Correctional Facility, where he received a ticket for attempted receipt of a handcuff key and fifty dollars in the mail. A visitor ban was placed on Plaintiff on February 13, 2004. Plaintiff claims that this visitor restriction has been improperly maintained, despite the fact that he has been misconduct-free since May 6, 2004, and despite his multiple requests that the ban be lifted. Plaintiff claims that the visiting ban has become de facto permanent, and that Warden Curtin, Deputy Director Straub, Deputy Warden Tribley, and Warden McQuiggin have violated his First and Fourteenth Amendment rights by not removing the ban.

Plaintiff also claims that Special Activities Coordinator Burnett improperly denied his request to participate in MDOC's kosher meal program despite Plaintiff's sincere religious belief that he follow a kosher diet. Following an interview of Plaintiff by Chaplain Snyder on August 26, 2007, Plaintiff states that he received a written denial on September 20, 2007, stating that Defendant Burnett had denied his request. Plaintiff contends that this denial violated his First Amendment rights. Additionally, Plaintiff states that Defendants Burnett and Caruso violated his Fourteenth Amendment rights by ignoring MDOC policies and procedures, failing to provide Plaintiff with

adequate explanation of the basis of the denial, failing to use an objective, substantive criteria to make the decision, and making the decision without sufficient process. Additionally, Plaintiff claims that Defendant Burnett violated the Religious Land Use and Institutionalized Persons Act (RLUIPA) by imposing a substantial burden on his religious exercise that does not further a compelling interest, or if it does, is not the least restrictive means of doing so.

Plaintiff alleges in his complaint that he was shipped four books, one catalog, and one author's guidelines from American Atheist Press, the publisher of the items. Mail Clerk Pittsley rejected these items because they were used and because they came from an unauthorized publisher, in violation of MDOC policy. Plaintiff states that this policy was signed and approved by Director Caruso. At a hearing concerning the rejected items, Resident Unit Manager Sackett allowed the catalog and guidelines, but upheld the rejection of the books because they were used. Plaintiff states that Defendant Sackett's written decision failed to state why he felt that the books were used as opposed to damaged, other than a statement that one of the books appeared to have coffee stains on it. Plaintiff claims that Defendants Pittsley and Sackett violated his First and Fourteenth Amendment rights by depriving him of the books arbitrarily and capriciously, by failing to provide some evidence that the books were used rather than damaged, by failing to give him a meaningful opportunity to challenge the determination by inspecting the books, and by failing to make de minimis cost inquiries to determine if the books were used by contacting the publisher. Plaintiff additionally claims that Defendants Pittsley, Sackett and Caruso violated his First Amendment rights by rejecting books sent from an approved vendor merely because they were used, and therefore rejecting the books without a reasonable basis.

Finally, Plaintiff claims that Warden Curtin, Warden McQuiggin, and Director Caruso, by promulgating an MDOC policy mandating that prisoners in segregation be required to

4

wear MDOC-issued segregation shoes, violated Plaintiff's Eighth Amendment rights and violated their common law duty of care to Plaintiff. Plaintiff states that Defendants acted with deliberate indifference to the risk of harm created by allowing Plaintiff to wear these shoes while engaging in daily exercise. Plaintiff states that, as a result of engaging in daily exercise while wearing these shoes, he suffered an injury to his left foot that required medical treatment and that has prevented Plaintiff from engaging in daily exercise involving his left foot.

Several of the Defendants claim that they are entitled to summary judgment on some of Plaintiff's claims because Plaintiff failed to exhaust his available administrative remedies. Pursuant to the applicable portion of the Prison Litigation Reform Act (PRLA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective Dec. 19, 2003)[1], sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ R. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶¶ R, X. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ T (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ Y.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within five business days of the response, or if no response was received, within five days after the response was due. *Id.* at ¶¶ R, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances. *Id.* at ¶ FF. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ R, HH. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II

---

[1]The MDOC amended Policy Directive 03.02.130 on July 9, 2007. However, the 2003 version of the policy directive was in effect for most of the applicable time period. Moreover, changes in the policy do not affect the analysis of Plaintiff's claims.

response was due. *Id.* at ¶ HH. The Prisoner Affairs Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ II. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ U. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ." *Id.*

In addition, the grievance policy provides that, where the grievance alleges staff brutality or corruption, the grievance may be submitted directly to Step III. *Id.* at ¶S. In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I. *Id.*

Defendants Curtin, Straub and Tribley assert that Plaintiff failed to exhaust his administrative remedies with regard to his visiting ban claim against them. Additionally, Defendant Caruso claims that Plaintiff failed to exhaust his administrative remedies with regard to his Kosher diet and book rejection claims against her. Defendant Curtin claims that Plaintiff failed to exhaust his administrative remedies with regard to his inadequate shoes claim against her. A prisoner must specifically mention the involved parties in the grievance to make prison officials aware of the problems so that the prison has a chance to address the claims before they reach federal court. *Bell v. Konteh*, 450 F.3d 651, 653 (6th Cir. 2006); *Curry v. Scott*, 249 F.3d 493, 505 (6th Cir. 2001); *accord Harbin-Bey v. Rutter*, 420 F.3d 571, 581 (6th Cir. 2005); *Burton v. Jones*, 321 F.2d 569, 574-75 (6th Cir. 2003); *Vandiver v. Martin*, No. 02-1338, 2002 WL 31166925, at *2 (6th Cir. Sept. 27, 2002) ("The issues [plaintiff] may raise, and the defendants he may name, in his lawsuit are limited to the specific issues raised, and the specific individuals mentioned, in his grievance."). Plaintiff concedes that he failed to name Defendants Straub and Tribley in his visiting ban grievance forms. However, Plaintiff claims that he did name Defendant Curtin in his visitation ban claim. In support

of this assertion, Plaintiff cites grievance No. 32728E. The Step I grievance form is not attached, but Defendant Curtin is named in the Step II and III grievance appeals. (*See* docket # 1, Plaintiff's exhibit # A.13.) Therefore, the undersigned concludes that a genuine issue of material fact remains as to whether Defendant Curtin was named in a grievance. Consequently, Defendant Curtin is not entitled to summary judgment for Plaintiff's failure to exhaust with regard to his visitation ban claim. An examination of Plaintiff's Kosher diet and book rejection grievance forms reveals that Defendant Caruso was not named in a grievance. (*See* docket #1, Plaintiff's exhibits #B.4, #C.3 and #C.4.) Nor did Plaintiff name Defendant Curtin in his grievance regarding inadequate shoes. (*See* docket #1, Plaintiff's exhibits #D.3 and #D.4.) Therefore, the undersigned concludes that Defendants Straub and Tribley are entitled to summary judgment for failure to exhaust administrative remedies with regard to Plaintiff's visiting ban claim. Additionally, the undersigned concludes that Defendant Caruso is entitled to summary judgment for failure to exhaust administrative remedies with regard to Plaintiff's Kosher diet and book rejection claims, and Defendant Curtin is entitled to summary judgment for failure to exhaust administrative remedies with regard to Plaintiff's inadequate shoes claim.

Defendants also claim that, even if Plaintiff exhausted his administrative remedies, they are entitled to summary judgment on Plaintiff's visiting ban claim. Plaintiff alleges that his First and Fourteenth Amendment rights have been violated by the visitation ban that has been imposed on him since 2004. With regard to non-religious First Amendment associational rights, the Supreme Court has said:

> First Amendment associational rights...likewise must give way to the reasonable considerations of penal management. As already noted, numerous associational rights are necessarily curtailed by the realities of confinement. They may be curtailed whenever the institutions officials, in the exercise of their informed discretion, reasonably

> conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment.

*Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977).

Plaintiff's visits were restricted pursuant to MDOC policy, following Plaintiff's escape attempt and receipt of contraband items in the mail. Defendants state that the policy prevents prisoners from receiving contraband items smuggled in by visitors, deters prisoners from attempting to engage in escape attempts, and encourages prisoners to engage in positive behavior by rewarding them with visits. The undersigned concludes that this ban is reasonably related to the legitimate penological objective of prison security.

The Supreme Court upheld an MDOC visitation ban for inmates with substance abuse violations in *Overton v. Bazzetta*, 539 U.S. 126 (2003). The Court did state that evidence of a "de facto" ban on an inmate might lead to a different result. *Id*. at 172. In this case, Plaintiff has been able to reapply for visits following a six month period, and he can continue to reapply in the future. Given that fact, and given the seriousness of Plaintiff's attempted escape offense, the undersigned concludes that a "de facto" ban has not been placed on Plaintiff. Therefore, Defendants are entitled to summary judgment with respect to this claim.

Defendants also claim that they are entitled to summary judgment with respect to Plaintiff's Kosher diet claim. Plaintiff alleges that his First Amendment rights were violated when Defendant Burnett denied his request for a Kosher diet. While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, Plaintiff must establish that:

(1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348,1997 WL 428903, at *2 (6th Cir. July 30, 1997) ("sincerely held religious beliefs require accommodation by prison officials").

While inmates retain First Amendment rights to the free exercise of religion, prison officials may impinge on these constitutional rights if the regulation "is reasonably related to legitimate penological interests." *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

1.  does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
2.  are there alternative means of exercising the right that remain open to prison inmates;
3.  the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
4.  whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

Failure to satisfy the first factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-90) ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational"). If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily

weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted). It should further be noted that the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id.*

In this case, Plaintiff asserts that a Kosher diet is required by his religious beliefs, and therefore explains how his First Amendment right to the free exercise of religion was impaired when he was denied the Kosher diet. However, as Defendants argue, prison officials have a clear, legitimate penological interest in considering budgetary constraints and restricting expenses within the prison system. Furthermore, there is a valid, rational connection between this government interest and ensuring that only sincere believers whose faith requires that they keep Kosher receive a Kosher diet, which costs twice as much as regular meals served by the MDOC. Consequently, the first *Turner* factor is satisfied. In considering the remaining *Turner* factors, the undersigned again notes the cost of providing Kosher meals and its effect on prison resources, along with Plaintiff's ability to reapply for the meal program. The undersigned concludes that the denial of the Kosher meal plan did not violate Plaintiff's First Amendment rights.

Furthermore, Plaintiff's complaint, as well as the attached documents, establish that if Plaintiff had a right implicating the due process protections of the Constitution, Plaintiff received due process of law. In all cases where a person stands to be deprived of his life, liberty or property, he is entitled to due process of law. This due process of law gives the person the opportunity to convince an unbiased decision maker that, for example, he has been wrongly or falsely accused or

that the evidence against him is false. *Zinermon v. Burch*, 494 U.S. 113, 127-28, 110 S. Ct. 975, 984 (1990). The Due Process Clause does not guarantee that the procedure will produce a correct decision. "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284, n.9, 100 S. Ct. 553, 558, n. 9 (1980). "[T]he deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon*, 494 U.S. at 125, 110 S. Ct. at 983 (1990) (emphasis in original).

Plaintiff argues that he did not receive due process when his Kosher diet request was denied. Specifically, Plaintiff states that he was not provided with an adequate explanation of the basis of the denial, and that the denial was made without use of objective criteria and with insufficient process. The undersigned concludes that Plaintiff received due process, in the form of the written and in-person interviews with Chaplain Snyder, and Plaintiff's ability to reapply for the program. The undersigned also rejects Plaintiff's assertion that the denial was made without use of objective criteria, and finds that the questions posed to Plaintiff by Chaplain Snyder conformed with due process requirements in their attempts at measuring Plaintiff's sincere belief. Therefore, the undersigned concludes that Plaintiff has failed to show a Fourteenth Amendment violation.

Plaintiff further alleges that the denial of his Kosher meal request was a violation of RLUIPA. In relevant part, RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of

religious belief." 42 U.S.C. § 2000cc-5(7). While this definition of religious exercise is broad, it does require that Plaintiff's religious beliefs be "sincerely held." *See, e.g., Episcopal Student Foundation v. City of Ann Arbor*, 341 F.Supp.2d 691, 700 (E.D. Mich. 2004) (citation omitted); *Lovelace v. Lee*, 472 F.3d 174, 187 n.2 (4th Cir. 2006) (citations omitted). However, prison officials may not inquire into whether a particular belief or practice is "central" to a prisoner's religion. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (recognizing that "the truth of a belief is not open to question, rather the question is whether the objector's beliefs are truly held").

While the phrase "substantial burden" is not defined in RLUIPA, courts have concluded that a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. 729, 733-34 (6th Cir., Dec. 10, 2007) (citations omitted); *see also*, *Marshall v. Frank*, 2007 WL 1556872 at *5 (W.D. Wis., May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)) (a substantial burden is one which renders religious exercise "effectively impracticable"); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).

By the same token, a burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise," *see, e.g., Konikov v. Orange County, Florida*, 410 F.3d 1317, 1323 (11th Cir. 2005), or does not "pressure the individual to violate his or her religious beliefs." *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. at 734. Such conclusions recognize that RLUIPA was not intended to create a cause of action in response to every

decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761.

Even if Defendant Burnett's decision to deny Plaintiff's request for a Kosher meal plan substantially burdened Plaintiff's ability to practice his religion, Burnett is nonetheless entitled to summary judgment if he establishes that his actions constitute the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-1(a).

Plaintiff asserts that the denial of his Kosher diet request placed a substantial burden on his ability to practice the tenants of his Jewish faith. He claims that eating a Kosher diet is required by his faith. To support his claims of sincere belief in the Jewish faith, Plaintiff references his signed declaration of Judaism as his religious preference, which was submitted to the MDOC a month before his request for a Kosher diet, along with a copy of his written answers to eligibility questions that was submitted to Chaplain Snyder. (*See* docket #1, Plaintiff's exhibit #B.15.) Plaintiff also submits evidence of library requests for texts on Judaism. (*See* docket #1, Plaintiff's exhibits ## B.6-B.11.) However, as Defendants note, these requests were made *after* Plaintiff's request for the Kosher meal plan was denied.

In their motion for summary judgment, Defendants argue that Plaintiff's beliefs were not sincerely held. Defendants have the right to ensure that each prisoner is sincere in his belief before allowing him access to the Kosher Meal Program. The use of MDOC Operating Procedure 05.03.150 was a legitimate means of determining whether a prisoner is entitled to the Kosher menu. The MDOC Operating Procedure 05.03.150-A provides:

> K.  A prisoner who wants to participate in the Kosher Meal Program must submit a written request to the Warden or designee for approval. The request shall include a statement as to his/her religious beliefs which necessitate a Kosher diet.

L.  Upon receipt of such a request, the Warden shall verify that the prisoner is eligible to participate in the Kosher Meal Program based on the prisoner's designated religion by requiring the Assistant Deputy Warden for Programs or the chaplain to interview the prisoner and obtain a response to the following questions:

> 1.  Briefly explain the major teachings of your designated religion.
>
> 2.  Why is a kosher diet required by this religion?
>
> 3.  What is a kosher diet?  In other words, how does it differ from food otherwise prepared by the institution?  What types of food are not allowed?

Defendant Burnett explained the reason that plaintiff's request for a Kosher diet was denied:

> Kinney #253729 requested accommodation with the Kosher menu. It is noted Kinney only recently "converted" from Protestant Christianity to Judaism, and that "conversion" was recorded in CMIS on 8/1/07, perhaps in preparation for this religious menu request. Kinney provided a three page document in response to the questions asked in OP 05.03.150A.  Kinney was interviewed by Keith Snyder, Chaplain.  Snyder reports Kinney was able to provide rather limited information in contrast to the information provided on the submitted sheets.  Perhaps those sheets were simply copied from another source. Kinney did not bother to familiarize himself with that information so that he could provide it during the interview.  It is evident Kinney had material available, but lacked the commitment to his faith to learn the material.  This suggests he is motivated by something other than a sincere desire to pursue the practices of his faith.  During the interview, Kinney usually spoke of Jews in the third person, rather than identifying himself as one of them.  His information about Judaism was general and may well have been learned during his Protestant Christian exposure.  While sincerity is based on extrinsic data that may be difficult to ascertain, it appears that Kinney has not been sincere about pursuing the practices of his faith.  If he was sincere, it is expected he would have studied his faith and its Kosher requirements enough to have provided more correct and more complete responses to the questions in the interview.  Consequently, based on the information available to me, and based on the appearance that he is not motivated by a sincere desire to pursue the practices of Judaism, Kinney's request for Kosher accommodations is denied at this time.  He should not be transferred for the purpose of Kosher accommodations.

It is understood that denial of admission to a special religious menu is not a failure to recognize faith preference. Requests to declare faith preference, to attend religious services, and/or to purchase and possess religious property must be processed according to Department policy.

In this case, under a totality of the circumstances approach, Defendants have articulated valid reasons which justify the refusal to provide plaintiff a Kosher diet. Based upon Plaintiff's interview and the information gathered by Defendants, it was not unreasonable to deny Plaintiff's request. Plaintiff exhibited a lack of knowledge of the requirements of Judaism. The policy used by the prison and the interview process is not a pass or fail test. The prison must have some standards to determine the sincerity of a religious belief before granting an accommodation request. Accordingly, Defendants' determination that Plaintiff showed a lack of sincerity should not be disturbed by this Court. In the opinion of the undersigned, typically it is difficult for a Defendant to establish that a Plaintiff's religious belief is not sincerely held. Prisoners are not automatically entitled to specific religious accommodations just by claiming an entitlement. The prison must maintain some aspect of control in accommodating prisoners needs. Defendants have the right to make sure that each prisoner is sincere in his belief before allowing a prisoner access to a religious based meal program. It is recognized that this is a very difficult task to undertake. However, a lack of the basic knowledge regarding why specific food must be consumed for a religion is a strong indication of a lack of sincerity. Under the circumstances of this case, it is the opinion of the undersigned that Defendants correctly considered Plaintiff's sincerity and made an appropriate and well reasoned decision under the totality of facts available. In the opinion of the undersigned, Defendants are entitled to summary judgment on Plaintiff's RLUIPA and freedom of religion claims.

Defendants argue that they are entitled to summary judgment with regard to Plaintiff's claim regarding the books restriction. Plaintiff claims that his First and Fourteenth Amendment

rights were violated when he was not allowed to receive four books that he had ordered from the American Atheist Press, on the basis that the books were used. Generally, any regulation which infringes upon a fundamental right must be justified by a "compelling state interest." *See*, *for example*, *Wisconsin v. Yoder*, 406 U.S. 205 (1972). However, as a prisoner, plaintiff's constitutional rights are subject to severe restriction without such a showing. *See*, *for example*, *Bell v. Wolfish*, 441 U.S. 520 (1979) (restriction on receipt of reading materials); *Hudson v. Palmer*, 468 U.S. 517 (1984) (privacy); *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974) (right to call witnesses); *Richardson v. Ramirez*, 418 U.S. 24 (1974) (vote to close). *See*, *generally*, *Washington v. Harper*, 494 U.S. 210 (1990); *Turner v. Safley*, 482 U.S. 78 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).

As noted above, the standard by which prison regulations impinging on prisoner constitutional rights is judged is "reasonableness." *Turner v. Safley*, 482 U.S. 78 (1987); *Washington v. Harper*, 494 U.S. 210, 224 (1990). In *Turner*, the Supreme Court expressly rejected any degree of "heightened scrutiny" in order to ensure that "prisoner administrators. . .and not the courts. . .make the difficult judgments concerning institutional operations." *Turner*, 482 U.S. at 89, quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119 (1977).

Defendants argue that the MDOC policy forbidding prisoners from receiving used books helps to decrease the risk of prisoners receiving contraband in their mail. The undersigned concludes that the MDOC policy has a rational relationship to the legitimate interest of promoting prison security, and that the first *Turner* factor is therefore satisfied. *Turner*, 482 U.S. at 89-91. In addition, the undersigned notes that Plaintiff has the alternative option of ordering copies of the requested books that are not used, satisfying the second factor in *Turner*. *Id*. Therefore, Plaintiff has failed to show a First Amendment violation.

Furthermore, Plaintiff's complaint, as well as the attached documents, establish that if Plaintiff had a right implicating the due process protections of the Constitution, Plaintiff received due process of law with regards to his book ban claim. As is stated above, the Due Process Clause does not guarantee that the procedure will produce a correct decision. *Martinez*, 444 U.S. 277, 284, n.9, 100 S. Ct. 553, 558, n. 9; *Zinermon*, 494 U.S. at 125, 110 S. Ct. at 983. The undersigned concludes that Plaintiff received due process with regard to the restriction on the receipt of the ordered books. Defendant Pittsley provided a written explanation of her rejection of the books, and Plaintiff received a subsequent hearing. Following the hearing, Defendant Sackett provided a written explanation of his decision to uphold the restriction and the reasoning behind the decision. Plaintiff has failed to show a Fourteenth Amendment violation. Defendants are therefore entitled to summary judgment with regard to Plaintiff's book restriction claim.

Plaintiff alleges that Defendants violated his Eighth Amendment rights by failing to provide him with adequate shoes for engaging in the exercise necessary to maintain Plaintiff's mental and physical health and fitness. However, as noted by Defendants in their brief in support of summary judgment, the Defendants listed in Plaintiff's inadequate shoes claim were not personally involved in the activity forming the basis of the claim. Liability under Section 1983 must be based on more than merely the right to control employees. *Polk Co. v. Dodson*, 454 U.S. 312, 325-26 (1981); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Thus, Section 1983 liability cannot be premised upon mere allegations of *respondeat superior*. *Monell*, 436 U.S. at 691; *Polk*, 454 U.S. at 325. A party cannot be held liable under Section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See e.g. Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990); *Hays v. Jefferson*, 668 F.2d 869, 874

(6th Cir.), *cert. denied*, 459 U.S. 833 (1982). *See also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984).

Supervisory officials can be held liable for the acts of their subordinates only if plaintiff establishes that the supervisor failed to appropriately discharge his supervisory duties, and that this failure resulted in a denial or deprivation of plaintiff's federal rights. *See e.g. Leach*, 891 F.2d at 1246; *Hayes v. Vessey*, 777 F.2d 1149, 1154 (6th Cir. 1985). However, the failure of a supervisor to supervise, control or train the offending employee is not actionable absent a showing that the official implicitly encouraged, authorized, approved or knowingly acquiesced in, or in some other way directly participated in, the offensive conduct. *Leach*, 891 F.2d at 1246. Such a claim requires, at a minimum, that the official had knowledge of the offending employee's conduct at a time when the conduct could be prevented, or that such conduct was otherwise foreseeable or predictable. *See e.g. Gibson v. Foltz*, 963 F.2d 851, 854 (6th Cir. 1992). In addition, plaintiff must show that defendant had some duty or authority to act. *See e.g. Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) (lower level official not liable for shortcomings of building); *Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338, 351 (6th Cir. 1984) (mere presence at the scene is insufficient grounds to impose Section 1983 liability in the absence of a duty to act); *accord Hall v. Shipley*, 932 F.2d 1147 (6th Cir. 1991). In addition, merely bringing a problem to the attention of a supervisory official is not sufficient to impose such liability. *See Shelly v. Johnson*, 684 F. Supp. 941, 946 (W.D. Mich. 1987) (Hillman, C.J.), *aff'd* 849 F.2d 228 (6th Cir. 1988). Finally, supervisory liability claims cannot be based on simple negligence. *Leach*, 891 F.2d at 1246; *Weaver v. Toombs*, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd* 915 F.2d 1574 (6th Cir. 1990).

Plaintiff has not alleged facts establishing that Defendants Curtin, McQuiggin and Caruso were personally involved in the activity which forms the basis of his claim. Plaintiff states

that Defendants issued and promulgated the policy mandating the use of the footwear that he alleges is inadequate. However, he does not provide any facts showing that Defendants were aware of any problems that he had with the shoes, or injuries that resulted from their use, or even that Defendants were aware of problems caused to other inmates by the shoes. Accordingly, the Court concludes that Plaintiff's inadequate shoes claim against Defendants Curtin, McQuiggin and Caruso is properly dismissed for lack of personal involvement.

To the extent that Plaintiff is claiming his state law rights were violated in his inadequate shoes claim, it is recommended that this court refuse to exercise pendent jurisdiction over such claims. Claims raising issues of state law are best left to determination by the state courts, particularly in the area of prison administration. In addition, pendent jurisdiction over state law claims cannot be exercised after all federal claims have been dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966); *Moon v. Harrison Piping Supply, et al.*, 465 F.3d 719 (6th Cir. Sep. 28, 2006); *Smith v. Freland*, 954 F.2d 343, 348 (6th Cir.), *cert. denied*, 504 U.S. 915, 112 S.Ct. 1954 (1992).

> That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966).

Finally, Defendants assert that they are entitled to qualified immunity with respect to each of Plaintiff's claims.  Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful.  *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The procedure for evaluating claims of qualified immunity is tripartite:  First, we determine whether a constitutional violation occurred;  second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known;  finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.  *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999).

When determining whether a right is clearly established, this court must look first to decisions of the United States Supreme Court, then to decisions of the Sixth Circuit and to other courts within this Circuit, and finally to decisions of other circuits.  *Dietrich*, 167 F.3d at 1012.  An official action is not necessarily protected by qualified immunity merely because the very action in question has not previously been held to be unlawful.  Rather, in light of pre-existing law, the

unlawfulness of the official's conduct must be apparent. *Dietrich*, 167 F.3d at 1012; *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

When making a qualified immunity analysis, the facts must be interpreted in the light most favorable to the plaintiff. Part of the analysis is to determine whether there are any genuinely disputed questions of material fact. *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). Where there is a genuinely disputed question of fact, it is for the trier of fact to resolve, not the judge. "This would be true notwithstanding that the trial judge found the [defendant] officer to be more credible than the plaintiff because it is not for the court to make credibility determinations at this stage of the proceeding." *Id.*

The operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified.

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the preexisting law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639-40. *See also Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996), *cert. denied*, 520 U.S. 1157 (1997).

The Sixth Circuit has observed:

> A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred.

*Durham*, 97 F.3d at 866 (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).

Thus qualified immunity is not triggered only where the very action in question was previously held unlawful. *Anderson*, 483 U.S. at 639-40. Rather, the test is whether the contours

of the right were sufficiently clear that a reasonable official would understand that what he is doing violated plaintiff's federal rights.  *Id.*

Furthermore, a defendant need not actively participate in unlawful conduct in order to be liable under Section 1983.  Rather, a defendant may be liable where he has a duty to protect a plaintiff and fails to comply with this duty.  *Durham*, 97 F.3d at 866-868 (holding that a nurse and a security guard at a state hospital may be liable under Section 1983 where they do not take action to prevent a patient from being beaten).  *See also McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990)(a correctional officer who observes an unlawful beating may be liable under Section 1983 even though he did not actively participate in the beating), and *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), *cert. denied sub nom*, *Bates v. Bruner*, 459 U.S. 1171 (1983)(police officers who stood by and observed an unlawful beating by fellow officers could be held liable under Section 1983).

When faced with a qualified immunity defense, the court must first determine whether or not the plaintiff has stated a claim upon which relief can be granted.  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Turner*, 119 F.3d at 429.  If the court answers that question in the affirmative, the court goes on to determine whether or not the right allegedly violated was clearly established. *Turner*, 119 F.3d at 429.  These are both purely legal questions.  The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the defendants' conduct violated clearly established rights.  *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991).  For the above stated reasons, the undersigned concludes that Defendants have shown that there is no genuine issue of material fact that Plaintiff's constitutional rights were violated.  Therefore, the undersigned recommends that Defendants are entitled to qualified immunity.

23

For the foregoing reasons, I recommend that Defendants' motion for summary judgment (docket #46) be granted. Plaintiff's visitation claim against Defendants Straub and Tribley, his Kosher diet and book claims against Defendant Caruso, and his inadequate shoes claim against Defendant Curtin are properly dismissed without prejudice for failure to exhaust administrative remedies. Plaintiff's remaining claims are properly dismissed with prejudice for lack of merit.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.


 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  July 29, 2009


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).